**UNITED STATES of America, Appellee**

**v.**

**WESTERN ELECTRIC COMPANY, INC.; American Telephone and Telegraph Company, Appellees.**

**BellSouth Corporation, Appellant.**

**Bell Atlantic Corporation, Appellee.**

**No. 94–5252.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 16, 1994.

Decided Feb. 17, 1995.

Nathan Lewin, argued the cause for appellant. With him on the briefs were Richard W. Beckler, Stephen M. McNabb, Michael P. Goggin, William B. Barfield, Walter H. Alford and John F. Beasley.

David W. Carpenter, argued the cause for appellee American Tel. and Tel. Co. With him on the brief were Peter D. Keisler, Howard J. Trienens and Marc C. Rosenblum.

Nancy C. Garrison, Atty. U.S. Dept. of Justice, argued the cause for appellee U.S. With her on the brief were Anne K. Bingaman, Asst. Atty. Gen., and Catherine G. O'Sullivan, Atty., U.S. Dept. of Justice.

John Thorne, filed the brief for appellee Bell Atlantic Corp.

Before: EDWARDS, Chief Judge, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

We have before us still another appeal dealing with the antitrust consent decree—the "Modification of Final Judgment"—issued in *United States v. American Telephone & Telegraph Co.*, 552 F.Supp. 131, 226–34 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). The question is whether, under Rule 60(b) of the Federal Rules of Civil Procedure, the district court properly granted American Telephone and Telegraph Company's motion to modify restrictions imposed by the decree. The court's order permitted AT & T to acquire McCaw Cellular Communications, Inc., an independent, "non-wireline" carrier and the largest cellular telephone service provider in the United States. *United States v. Western Elec. Co.*, 158 F.R.D. 211 (D.D.C.1994).

Ten years ago, in compliance with the decree, AT & T divested itself of the Bell System's twenty-two companies that had been providing local telephone, or local exchange, service. "Thereafter, these regional Bell operating companies, or 'BOCs,' were to engage in two major activities: providing telephone service among parties within each local exchange and granting access to the exchanges to long-distance carriers." *Illinois Bell Tel. Co. v. FCC*, 988 F.2d 1254, 1257 (D.C.Cir.1993). "The consent decree also led to the creation of seven Regional Holding Companies (RHCs), each of which wholly owned and operated a set of BOCs." *Id.*

One of the RHCs, BellSouth Corporation, opposed AT & T's request for a modification and now brings this appeal. The United States and Bell Atlantic, an RHC, supported the modification and join AT & T in arguing in favor of affirming the district court's order.

I

A

The United States has twice sued AT & T for monopolization and other violations of the

Sherman Act, 15 U.S.C. §§ 1–3. The first action, begun in New Jersey federal court in 1949, ended with a consent decree in 1956. *United States v. Western Elec. Co.*, Civil Action No. 17–49 (D.N.J.). The government sued again in 1974 in the United States District Court for the District of Columbia. AT & T then owned local exchange monopolies, competed in the long-distance market, and manufactured and marketed the equipment used not only by telephone subscribers but also in the telecommunications network. This placed AT & T in a position to impede competition in the long-distance and telephone equipment manufacturing markets, or so the government claimed. *See generally American Tel. & Tel. Co.*, 552 F.Supp. at 222–23. After years of pretrial discovery and months of trial proceedings, but before the government had presented its rebuttal case, the parties proposed a settlement and a consent decree. The district court invited comments and held a hearing on the proposal. In August 1982, it issued a lengthy opinion approving the parties' proposed decree with ten modifications. *American Tel. & Tel. Co.*, 552 F.Supp. 131.

Section I of the consent decree, as modified, required AT & T to divest itself of those portions of the twenty-two Bell Operating Companies that had been providing monopoly local exchange services. AT & T was to separate the assets of the BOCs used to provide local exchange and exchange access services, and then transfer ownership of those separated portions to seven Regional Holding Companies, each of which would provide local exchange services in a specific region of the country. *Id.* at 226–27. Section II prohibited the divested BOCs from providing interexchange (long-distance) telecommunications services, and from manufacturing or providing "telecommunications products" either "directly or through any affiliated enterprise." *Id.* Other provisions in the decree directed the cancellation of contracts that had economically integrated the monopolies and the competitive portions of the Bell System; and required that, upon divestiture, each BOC undertake to eliminate any discrimination between AT & T and its long-distance and manufacturing competi-

tors. *Id.* at 226–27 (sections I(A) and II(A)–(C)).

B

Cellular radio is a service enabling mobile customers to place or receive telephone calls wherever they are located. It provides this capability over separate systems of radio and switching facilities that are interconnected to and dependent on the local bottleneck "landline" telephone monopoly. The Federal Communications Commission began receiving applications for cellular radio licenses before the district court entered its consent decree in this case. By the time AT & T divested itself of the BOCs—January 1, 1984—many licenses in the top thirty markets had been granted. The Commission had initially decided to allocate two bands of the radio spectrum to the development of cellular service in each of the country's regional telephone areas. "A" block licenses were awarded to companies not associated with the local BOC; "B" block licenses were awarded to the BOCs. Each divested RHC succeeded to each of the Bell System's "B" block cellular licenses and license applications in that RHC's region. Since then, "B" block licenses have generally remained under the control of the RHCs. Interests in the "A" block licenses, however, have frequently changed hands. In the mid–1980's, the RHCs began seeking to purchase "A" block cellular systems outside their regions. At the urging of the Department of Justice, the district court ruled that the consent decree prohibited such acquisitions. *United States v. Western Elec. Co.*, 627 F.Supp. 1090, 1104–09 (D.D.C.1986). This court reversed. The court thought it likely that "the parties and the district court never considered the possibility that the BOCs might want to provide exchange services outside of their geographic regions." *United States v. Western Elec. Co.*, 797 F.2d 1082, 1091 (D.C.Cir.1986). As a result, they could not have agreed to bar such extraterritorial business ventures and the decree itself contained no such express or implied geographic prohibition. *Id.* at 1089–92. After this court's decision, the Commission approved the RHCs' acquisition of "A" block licenses outside their own regions. *See*

*In re James F. Rill & Pacific Telesis Group,* 1 F.C.C.R. 918 (1986).

C

McCaw Cellular Communications, Inc., the nation's largest provider of cellular services, has a majority or minority interest in many "A" block cellular radio systems that provide local telephone service and thus compete with the BOC or other carrier possessing the "landline" telephone monopoly in the relevant geographic region. McCaw originally acquired many of its cellular interests through partnerships with other nonwireline carriers. After the Federal Communications Commission altered its licensing policies, and after this court ruled in *United States v. Western Electric Co.,* 797 F.2d 1082, RHCs began acquiring McCaw's former partners and their controlling interests outside the particular RHC's region, thus rendering the RHCs McCaw's *de facto* partners.

In April 1994, several months after AT & T announced its intention to acquire McCaw, the district court decided that the merger would violate section I(D) of the consent decree. *United States v. Western Electric Co.,* 154 F.R.D. 1, 4–5 (D.D.C.1994). The RHCs' post-divestiture acquisitions of McCaw's partners had converted each of the extraregional cellular systems in which an RHC had a majority or other controlling interest into a "Bell Operating Company" within the meaning of the consent decree. Section IV(C) of the decree defines a "Bell

Operating Company" as any one of the original twenty-two BOCs and "any entity directly or indirectly owned or controlled by a BOC or affiliated through substantial common ownership."[1]  *Western Elec. Co.,* 552 F.Supp. at 228. Section I(D) of the decree provides in its entirety:

> After the reorganization specified in paragraph I(A)(4), AT & T shall not acquire the stock or assets of any BOC.

*Id.* at 227.

The district court further held that it could not modify the decree to allow the transaction unless AT & T satisfied Rule 60(b), FED.R.CIV.P., as interpreted in *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 383–85, 112 S.Ct. 748, 760, 116 L.Ed.2d 867 (1992).[2]  *Western Elec. Co.,* 154 F.R.D. at 8. The court denied AT & T's waiver request, finding the record insufficient to support it, but said the company could refile, which it did on May 31, 1994. The United States and one RHC supported AT & T's renewed waiver request. BellSouth objected. On August 25, 1994, the court issued an Order and Opinion granting AT & T a limited waiver of section I(D) to allow the merger.[3]  *Western Elec. Co.,* 158 F.R.D. at 212–13. AT & T and McCaw consummated their transaction on September 19, 1994, after this court denied BellSouth's motion to stay the district court's order, and after the Federal Communications Commission approved the merger. *In re Applications of Craig O. McCaw and AT & T,* File No. ENF–93–44, 1994 FCC LEXIS 4603 (Sept. 19, 1994), *appeals pending sub*

1. Because the shareholders of the Regional Holding Companies directly own the Regional Holding Companies and indirectly own the Bell Operating Companies, the Regional Holding Companies fall within the consent decree's definition of "Bell Operating Companies," in that they are "affiliated through substantial common ownership." *United States v. Western Elec. Co.,* 797 F.2d at 1088.

2. The United States filed a complaint against AT & T and McCaw in the United States District Court for the District of Columbia alleging that the merger, if unrestrained, would violate § 7 of the Clayton Act, 15 U.S.C. § 18. *See United States v. AT & T,* No. 94–1555 (D.D.C. filed July 15, 1994). In that action, the parties agreed to a proposed consent decree and various stipulations allowing the merger to proceed. As part of the agreement, AT & T and McCaw agreed to abide by the proposed decree until the court approves

or rejects it in the required "public interest" proceedings under the Tunney Act, 15 U.S.C. § 16.

3. The Order requires AT & T to divest itself of all interests in the section I(D) cellular systems owned by McCaw that qualify as BOCs if the court should determine, after full consideration of the record to be generated in the Tunney Act proceedings, that the waiver is not in the public interest and cannot be modified to satisfy that requirement. *Western Elec. Co.,* 158 F.R.D. at 223.

While the pendency of the Tunney Act proceedings might render the court's order in this case less than final, this does not affect our jurisdiction. Under 28 U.S.C. § 1292(a)(1), the courts of appeals have jurisdiction over "[i]nterlocutory orders of the district courts ... modifying ... injunctions...."

*nom. BellSouth v. FCC,* Nos. 94–1639 *et al.* (D.C.Cir.).

## II

While BellSouth vigorously contests the waiver granted to AT & T, neither it nor anyone else denies that district courts have the power to modify injunctions by "waiving" a particular provision. Section VII of the decree in this case left open the possibility of future revisions and expressly reserved to the district court the authority to make them. It provides that the court will retain jurisdiction of the case "for the purpose of enabling any of the parties to this Modification of Final Judgment ... to apply to this Court at any time for such further orders or directions as may be necessary or appropriate ... for the modification of any of the provisions hereof...." *Western Elec. Co.,* 552 F.Supp. at 231.[4] This suggests a test—"necessary or appropriate"—but no one argues in favor of it. The assumption of all parties to this appeal is that a modification or waiver may be granted under section VII only if the general rules governing judicial revision of judgments are satisfied.

■ Those general rules too are not in doubt. "The power of a court of equity to modify a decree of injunctive relief," Judge Friendly wrote in his influential opinion in *New York State Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d 956, 967 (2d Cir.), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983), "is long-established, broad, and flexible." At the request of the party who sought the equitable relief, a court may tighten the decree in order to accomplish its intended result. *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 252, 88 S.Ct. 1496, 1501, 20 L.Ed.2d 562 (1968). At the request of the enjoined party, the court may relieve the party of the decree's constraints. Modifications of the latter sort now come within Rule 60(b)(5), FED. R.CIV.P., which has been described as "little more than a codification of the universally recognized principle that a court has continuing power to modify or vacate a final decree," 11 CHARLES A. WRIGHT, ET AL.,FEDERAL PRAC-

TICE & PROCEDURE § 2961 (1994). Rule 60(b)(5) provides:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application....

We are concerned here with the "no longer equitable" portion of Rule 60(b)(5) and the Supreme Court's interpretation of this language in *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), an "institutional reform" case in which a consent decree governed the building of a jail. Until *Rufo,* courts had been uncertain whether *United States v. Swift & Co.,* 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932), decided long before adoption of the rule, controlled its application. *Swift* had announced a stringent test: with respect to the antitrust consent decree before the Court, "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions" would warrant modifying the decree at the behest of the enjoined parties. 286 U.S. at 119, 52 S.Ct. at 464. On its face *Swift's* "grievous wrong" language seemed to reflect a "hardening of the usual standards for modifying decrees of injunctive relief...." *New York State Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d at 968. The setting of *Swift,* however, indicated that the opinion might have a more limited compass: the defendants there had waged a strenuous campaign to avoid compliance; and the "modification on which the Supreme Court passed in *Swift* would have robbed the 1920 consent decree of so much of its force that the Court considered it 'revers[al] under the guise of readjustment', 286 U.S. at 119 [52 S.Ct. at 464]." 706 F.2d at 968.

Any doubts about the continued significance of *Swift* were, we believe, laid to rest

---

4. This is a boilerplate retention-of-jurisdiction clause. *See* Note, *Flexibility and Finality in Anti-*

*trust Consent Decrees,* 80 HARV.L.REV. 1303, 1308–09 (1967).

in *Rufo*. Relying substantially on *New York State Ass'n for Retarded Children, Inc. v. Carey*, the Supreme Court rejected the idea that Rule 60(b)(5) codified *Swift*'s "grievous wrong" test. 502 U.S. at 378–79, 112 S.Ct. at 757. Rather, Rule 60(b)(5) set down a "less stringent ... standard" intended to meet the "need for flexibility in administering consent decrees," *id.* at 380, 112 S.Ct. at 758. All parties to this appeal—AT & T, the United States, BellSouth and Bell Atlantic—therefore agree that in reviewing the district court's order we must look to *Rufo* rather than *Swift.* Two courts of appeals, however, have treated *Rufo* as a decision limited to institutional reform litigation, *see Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1148–49 (6th Cir.1992) (*in banc*), *cert. denied,* —— U.S. ——, 113 S.Ct. 2998, 125 L.Ed.2d 691 (1993); *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 977 F.2d 558, 562 (Fed.Cir.1992); another has expressly reserved the question, *Favia v. Indiana Univ. of Pennsylvania*, 7 F.3d 332, 341 n. 15 (3d Cir.1993); and we have been less than clear about the matter. *See United States v. Western Electric Co.*, 969 F.2d 1231, 1257 n. 7 (D.C.Cir.1992).

The limited view of *Rufo*, expressed in *Lorain* and *W.L. Gore*, relies on the idea that it should generally be easier to modify an injunction in an institutional reform case than in other kinds of cases. Statements in *Rufo* support this general proposition. But neither *Lorain* nor *W.L. Gore* mentions what for us is the principal significance of *Rufo*— its ruling that Rule 60(b)(5) does not incorporate the "grievous wrong" test of *Swift.* While *Swift* itself was an antitrust case, *Rufo's* holding on this particular issue did not purport to rest on differences between institutional reform cases and antitrust cases, and the Court suggested none. 502 U.S. at 380, 112 S.Ct. at 758. After rejecting *Swift*'s formulation, *Rufo* filled the vacuum with what it had designated as the "traditional" standard (*id.* at 379–80, 112 S.Ct. at 757–58)

for modifying injunctions. To be sure, the Court interspersed its ensuing discussion with references to institutional reform litigation (*id.* at 383–91, 112 S.Ct. at 760–63). But it did so in the context of interpreting the broad language of Rule 60(b)(5),[5] which also does not draw distinctions based on the nature of the litigation. We therefore agree with two other courts of appeals that *Rufo* gave the *"coup de grace"* to *Swift* and that the Supreme Court's summary of what might render a modification "equitable" relates to all types of injunctive relief. *In re Hendrix,* 986 F.2d 195, 198 (7th Cir.1993); *see also Patterson v. Newspaper & Mail Deliverers' Union of New York,* 13 F.3d 33, 37–38 (2d Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 58, 130 L.Ed.2d 16 (1994).

Furthermore, the reasons given in *Rufo* for allowing flexibility in institutional reform cases apply with at least as much force here. The AT & T consent decree has had a profound national impact. It regulates a large portion of the complex telecommunications industry where new technology is continually developing. It has reached far "beyond the parties involved directly in the suit," and has significantly affected the public. 502 U.S. at 381, 112 S.Ct. at 759 (citation omitted). *Cf. Patterson,* 13 F.3d at 37–38. *Swift* itself acknowledged the difference between decrees that "give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative." *Swift,* 286 U.S. at 114, 52 S.Ct. at 462. The AT & T consent decree falls into the latter category.

After disposing of *Swift,* the Court in *Rufo* proceeded to describe circumstances that *might* warrant revision of consent decrees. We stress the "might" because the Court, having first pronounced Rule 60(b)(5) "flexible," was careful not to reintroduce rigidity. Hence, a "party seeking modification of a

---

5. In addition to Rule 60(b)(5), the defendants in *Rufo* invoked Rule 60(b)(6), which authorizes district courts to grant relief for "any other reason justifying relief from the operation of the judgment." In part II of its opinion, the Supreme Court held that the lower courts had misconstrued both Rule 60(b)(5) and Rule 60(b)(6). 502 U.S. at 378–79, 382–83, 112 S.Ct. at 757, 759. However, part III of the opinion, which elaborates on the proper standard, appears directed only at Rule 60(b)(5). *Id.* at 383–93, 112 S.Ct. at 760–64.

consent decree *may* meet its initial burden by showing either a significant change in factual conditions or in law." *Id.* at 384, 112 S.Ct. at 760 (emphasis added). "Modification of a consent decree *may be* warranted when changed factual conditions make compliance with the decree substantially more onerous." *Id.* (emphasis added). *"Ordinarily,* however, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.* at 385, 112 S.Ct. at 761 (emphasis added). *"If it is clear* that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a *heavy burden* to convince a court that it agreed to the decree in good faith, made a *reasonable* effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." *Id.* at 385, 112 S.Ct. at 761 (emphasis added). "Once a moving party has met its burden of establishing either a change in fact or law warranting modification of a consent decree, the District Court should determine whether the proposed modification is *suitably tailored* to the changed circumstance." *Id.* at 391, 112 S.Ct. at 763 (emphasis added).

It is these general principles that the district court applied in this case, or as Bell-South contends, misapplied.

### III

■ Adhering to *Rufo* (502 U.S. at 383, 112 S.Ct. at 760), the district court determined that the first question regarding AT & T's request for a waiver of section I(D) was whether a significant and unanticipated change in factual conditions had occurred. That the RHCs' providing exchange services outside their regions constituted a change in conditions is clear enough. At the time of the decree the operating companies had not expanded into extraregional "A" block markets. The serious issue then was whether the parties and the court had anticipated that development. This was essentially a question of fact. *See Railway Employees v. Wright,* 364 U.S. 642, 647–48, 81 S.Ct. 368, 371–72, 5 L.Ed.2d 349 (1961); *Crumpton v.*

*Bridgeport Educ. Ass'n,* 993 F.2d 1023, 1030 (2d Cir.1993).

The district court found that the changes were not anticipated. Among the most important items supporting this finding is the court's 1982 opinion accompanying the decree. This indicates, as we said in *United States v. Western Electric Co.,* 797 F.2d 1082, 1091 (D.C.Cir.1986), that "the parties and the district court never considered the possibility that the BOCs might want to provide exchange services outside their geographic regions." When the United States and AT & T formulated the decree, in other words, they did not suppose that the resulting RHCs would wind up providing local telecommunications services outside their regions, and thereby convert "A" block cellular systems into "Bell Operating Companies" within the decree's definition. *Western Elec. Co.,* 158 F.R.D. at 216. Only a year after entering the decree the district court wrote that "[w]ith respect to exchange telecommunications ... the Operating Companies and the Regional Companies will, by definition, be limited to clearly defined geographic areas...." *United States v. Western Electric Co.,* 569 F.Supp. 1057, 1081 (D.D.C.1983). In 1984 the district court added that "[n]o one connected with the negotiation, the drafting, or the modification of the decree envisioned that the Regional Holding Companies would seek to enter new competitive markets on a broad scale within a few months, let alone a few weeks after divestiture...." *United States v. Western Elec. Co.,* 592 F.Supp. 846, 858 (D.D.C.1984). In 1982 "exchange service consist[ed] principally of local landline telephone service, and it [was] hardly conceivable that one BOC would want to enter another BOC's area...." *Western Elec. Co.,* 797 F.2d at 1091. At the time, the RHCs suggested as much. *Id.* at 1090–91; *see also Western Elec. Co.,* 627 F.Supp. at 1106–08.

BellSouth counters these strong indicators of unanticipated change with the assertion that in 1982 everyone knew the forthcoming RHCs "could" acquire interests in "A" block licenses outside their regions as soon as the Federal Communications Commission altered its policies to permit this (as it ultimately did

in 1986). The point is not well-taken. Rule 60(b)(5) does not foreclose modifications based on developments that, in hindsight, were things that "could" happen. If the rule were so restricted, it would never be successfully invoked: whatever actually occurs after entry of the decree is necessarily something that could have occurred. The focus of Rule 60(b)(5) is not on what was possible, but on what the parties and the court reasonably anticipated. *Rufo* illustrates as much. The *Rufo* decree governed the county's building of a new jail and required the jail to provide single-cell occupancy, but a rapid increase in the jail population beyond projections—certainly something that was possible, something the parties knew could occur—rendered the new facility unable to accommodate the detainees on those terms. 502 U.S. at 375–76, 112 S.Ct. at 756. The Supreme Court nevertheless held that the increase in the jail population, if unanticipated, would qualify under Rule 60(b)(5) as an unforeseen change in circumstances. *Id.* at 385, 112 S.Ct. at 761.

■ BellSouth also criticizes the district court's finding of unanticipated change on another ground. It urges us to treat the consent decree as if it were a contract containing, by design, broad provisions forbidding activities in the distant future no matter how improbable these seemed during the drafting, provisions that must remain immutable. This is an odd argument since both the parties to this "contract"—AT & T and the United States—deny that they intended the decree to apply in the manner BellSouth suggests. In any event, we do not find BellSouth's contractual perspective an appropriate view of the district court's discretion. While the decree was "in some respects ... contractual in nature," it was "enforceable as a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo,* 502 U.S. at 378, 112 S.Ct. 112 S.Ct. at 757. A consent decree, in other words, is subject to modification to the same extent as if it had been entered as a final judgment after a full trial. The Supreme Court so held in *System Federation No. 91 v. Wright,* 364 U.S. 642, 651, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961): "The parties cannot, by giving each other consideration, purchase from a court of equity a continuing injunction." Interpreting provisions in the decree, as opposed to modifying it, may demand a different approach, *see United States v. Armour & Co.,* 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); *United States v. Western Elec. Co.,* 900 F.2d 283, 293 (D.C.Cir.1990), but interpretation is not our concern in this case.

■ The district court has been administering this decree since 1982. The court's judgment about what it and the parties contemplated twelve years ago is entitled to a large measure of respect. *See Hutto v. Finney,* 437 U.S. 678, 688, 98 S.Ct. 2565, 2572, 57 L.Ed.2d 522 (1978). There is no doubt that, as the court said, the concern at divestiture was whether the regional companies could remain "financially viable on their own—not whether they would soon be acquiring other businesses." *Western Elec. Co.,* No. 158 F.R.D. at 215 n. 11. That "the current situation—in which the 'A' block cellular systems at issue have become 'BOCs' within the meaning of the decree—was unforeseen" (*id.* at 216) is a conclusion amply supported in the record and one we will not disturb.

### IV

### A

Having found new and unanticipated developments, the district court next considered whether these changes warranted an adjustment in section I(D). Two critical points support the court's judgment in favor of AT & T: the decree was never meant to prevent AT & T from owning "A" block cellular systems; and the RHCs' acquisition of interests in such systems made section I(D) more onerous, encumbering AT & T with restrictions the parties and the court had expressly rejected at the time the decree was entered. *Western Elec. Co.,* 158 F.R.D. at 214.

As to the first, the district court's 1982 opinion specifically addressed cellular services and refused to adopt proposals to preclude AT & T from competing in such potential "bypass" technologies. *Western Elec.*

*Co.*, 552 F.Supp. at 175. Such a prohibition on AT & T alone, the court determined, "would artificially and unfairly restrict competition—an action antithetical to the purposes of the antitrust laws." *Id.* Until the RHCs obtained their out-of-region "A" licenses, the decree's section I(D) prohibition on AT & T's acquisition of "the stock or assets of any BOC" was consistent with this aspect of the court's 1982 decision. AT & T was forbidden from acquiring interests in "B" block cellular systems that were part of a BOC local exchange monopoly, but section I(D) did not prevent AT & T from entering the cellular market by acquiring interests in "A" block licenses.

As the RHCs began accumulating "A" licenses, however, the reach of section I(D) expanded greatly, barring AT & T from acquiring an interest in both cellular systems in all markets in which the local BOC holds the "B" license and an out-of-region RHC holds a controlling interest in the "A" license. With respect to the AT & T–McCaw merger, this gave rise to a matter of exceptional significance: the RHCs hold controlling interests in more than half of the twenty-five largest cellular markets, including systems that represent a major part of McCaw's value.

None of this, of course, rendered AT & T's continued compliance with the decree impossible. It could have simply walked away from McCaw. But impossibility is not the test. In *Rufo* the county sheriff wanted the decree modified to allow double cells in the new jail although the decree permitted only single cells. That the county could have maintained single cells by transferring the excess jail population to other facilities not covered by the decree (502 U.S. at 382, 112 S.Ct. at 759)—that compliance was, in other words, possible—did not constitute a basis for denying modification. *Id.* at 382, 387, 112 S.Ct. at 759, 762. Rather, in language that has become a major source of controversy in this case, the Court said:

> Modification of a consent decree may be warranted when changed factual circumstances make compliance with the decree

substantially more onerous. [502 U.S. at 384, 112 S.Ct. at 760.]

\* \* \* \* \* \*

If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b). [502 U.S. at 385, 112 S.Ct. at 761.]

BellSouth reads these passages as if they were part of a detailed code. It attacks the district court's decision on the ground that section I(D) is a "simple prohibitory injunction," commanding AT & T not to acquire certain stock or assets, and that there is nothing "onerous" in AT & T's complying with it. "It is extremely difficult to conceive of *any* situation in which such a negative judicial command could be too 'onerous.'" Brief of Appellant at 26. This surely proves too much. It would confer some special immutability on negative provisions in an injunction while leaving mandatory provisions subject to revision whenever they become, in the words of Rule 60(b)(5), "no longer equitable." Yet there is no reason why one form of injunctive relief should be treated differently than any other. Rule 60(b)(5) contains no qualification of this sort; and *Rufo* does not suggest that the Supreme Court meant to add one to the rule. There was a time when courts, following the lead of Lord Eldon in *Lane v. Newdigate*, 10 Ves.Jr. 192, 32 Eng. Rep. 818 (Ch. 1804), tried to draw the line BellSouth advocates, a line between mandatory and prohibitory injunctions. But that time is long gone. Experience has shown that the dichotomy is an illusion and cannot be maintained. "To the extent that mandatory and prohibitory represent semantic opposites, any rule based upon them is ridiculously easy to circumvent. The 'mandatory' injunction has not yet been devised that could not be stated in 'prohibitory' terms." Note, *Developments in the Law—Injunctions*, 78 Harv.L.Rev. 994, 1062 (1965).

We therefore decline to attribute significance to the form of section I(D) or to read the statements in *Rufo* with the "delusive exactness" BellSouth proposes. *Truax v. Corrigan,* 257 U.S. 312, 342, 42 S.Ct. 124, 133, 66 L.Ed. 254 (1921) (Holmes, J., dissenting). So long as the central purpose of the decree remains intact, a subject we next address, it is enough that the district court saw fit to exercise its considerable discretion under Rule 60(b)(5) on the bases that conditions had markedly changed; that the changes had not been anticipated; that as a result, the decree now prohibited significant business activity the court in 1982 had decided to allow; and that for AT & T, the decree had thus become "substantially more onerous." *Rufo,* 502 U.S. at 384, 112 S.Ct. at 760.

B

Despite BellSouth's objections, we think the district court was on solid ground in finding that its waiver of section I(D) "will not undermine the primary objective or purpose of either section I(D) or the decree as a whole," *Rufo,* 502 U.S. at 387, 112 S.Ct. at 762. *Western Elec. Co.,* 158 F.R.D. at 218–19. The central purpose of the consent decree was not "the separation of AT & T and the Regional Companies merely for the sake of separation," but removal of "the incentive and opportunity for the local bottleneck monopolies to discriminate in favor of AT & T's dominant interexchange services." *Id.* at 218; *see United States v. Western Elec. Co.,* 894 F.2d 1387, 1394 (D.C.Cir.1990). Granting the waiver to AT & T to allow it to acquire McCaw would interfere with this objective only if it allowed renewed integration between AT & T and a local bottleneck mo-

nopoly. Yet as the district court has found more than once, "A" block cellular systems are not bottleneck monopolies. *See, e.g., Western Elec. Co.,* 158 F.R.D. at 218 & n.17.

V

■ Is the waiver "suitably tailored" to resolve the specific problems created by the change in circumstances? *Rufo,* 502 U.S. at 391, 112 S.Ct. at 763–64. We agree with the district court that it is. The order waives one section of the decree for one transaction, the AT & T–McCaw merger, and thereby facilitates AT & T's participation in the wireless local exchange markets, a development the court predicted in 1982 would "actually further[ ] the competitive purpose of these [antitrust] laws."[6] *American Tel. & Tel. Co.,* 552 F.Supp. at 175 n.187. Otherwise the decree remains in force. The cellular systems in question will continue to be BOCs for the purposes of the decree's prohibition on long-distance services and its equal access requirement. This is far from the "blanket exemption for AT & T from Section I(D)," that BellSouth supposes. The court's order imposes conditions "designed both to ensure that the objectives of the decree are not undermined and to protect competition...." *Western Elec. Co.,* 158 F.R.D. at 219. It precludes AT & T from interfering, after the merger, with the BOCs' obligations under the decree. *Id.* The Order also requires AT & T to divest its interests in those cellular systems qualifying as "Bell Operating Companies" that it acquires through the merger if the district court determines, upon consideration of the record produced in the Tunney Act proceedings, that the waiver is not in the public interest. *Id.* at 219–20.[7]

---

**6.** While the waiver allows AT & T to become a *de facto* partner with certain RHCs, AT & T would directly compete with these same RHCs in other areas where AT & T is an owner of the "A" block license and the RHC owns the "B" block license.

**7.** BellSouth also raises an objection relating to its motion for "Generic Wireless Relief," filed shortly after the district court's initial decision on this matter in *United States v. Western Elec. Co.,* 154 F.R.D. 1 (D.D.C.1994). The motion seeks an order allowing BellSouth to provide wireless telecommunications service without the equal access requirement or geographic limita-

tions the decree demands. BellSouth requested the district court to consolidate its motion with the Tunney Act proceedings and AT & T's waiver motion. Exercising its broad discretion to control its docket, the district court refused. *Western Elec. Co.,* 158 F.R.D. at 220. BellSouth now argues that we should order the court to consolidate its motion with AT & T's waiver request *if* we reverse and remand for further proceedings on the waiver issue, which we have decided not to do. In any event, a trial court has inherent power to control the sequence in which it hears matters on its calendar and to decide whether to

## VI

To conclude, we sustain the district court's exercise of its discretion under Rule 60(b)(5) on the grounds that the entry of RHCs into extraregional "A" block cellular markets constituted a significant unanticipated change of circumstances, that the change rendered the decree substantially more onerous, that a modification of section I(D) in favor of AT & T was therefore warranted, and that the waiver granted to AT & T was suitably tailored.

*Affirmed.*

consolidate the proceedings on motions. *Landis v. North Am. Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 165–66, 81 L.Ed. 153 (1936); *Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492, 1495 (11th Cir.1985). It would serve no useful pur-

pose to recount the reasons given by the district court for refusing BellSouth's consolidation request. It is sufficient to say that the court's explanation amply supports its exercise of discretion. *Western Elec. Co.,* 158 F.R.D. at 220–21.